# IN THE COURT OF APPEALS OF IOWA

No. 19-1423
Filed October 7, 2020

IN THE MATTER OF THE SANDAHL TRUST (2017)

**KARIN L. SANDAHL, SUZANNE MORTON-MILLER, ELISE DONNON, CRAIG B. SANDAHL, and STEPHEN SANDAHL,**
Appellants.
_____

Appeal from the Iowa District Court for Polk County, Craig E. Block, Associate Probate Judge.

The appellants challenge the finding that Craig Sandahl did not amend his trust prior to his death. **AFFIRMED.**

Steven P. Wandro, Brian J. Lalor, and Kara M. Simons of Wandro & Associates, P.C., for appellants.

Matthew C. McDermott (until withdrawal), Wayne E. Reames, and Ryan G. Koopmans of Belin McCormick, P.C., Des Moines, for appellees Community Foundation of Greater Des Moines.

Thomas T. Tarbox of the Law Office of Thomas T. Tarbox, PC, Des Moines, for appellee Cathedral Church of St. Paul.

Thomas J. Houser of Davis Brown Law Firm, P.C., West Des Moines, for appellee UnityPoint Health-Des Moines Foundation.

Jay Syverson of Nyemaster Goode, PC, Des Moines, for appellee Mayo Clinic Foundation.

D. Scott Simpson of Simpson, Jensen, Abels, Fischer & Bouslog, P.C., Des Moines, for petitioner Iowa State Bank as Trustee of the Sandahl Trust (2017).

Considered by Bower, C.J., and Doyle and Schumacher, JJ.

**DOYLE, Judge.**

At issue is whether a document Craig Sandahl signed the day before his death is an amendment to the Sandahl Trust 2017 ("Trust") or a letter of instruction to his estate planning attorneys. Finding the document "vague, obscure, and ambiguous," and requiring speculation as to Craig's intent, the district court decreed the document was not an amendment to the Trust. We agree.

## I. Facts and Proceedings.

To dispose of his considerable wealth, Craig established the Sandahl Trust, a revocable grantor trust, in 1993. The Trust held all or substantially all of Craig's assets. Craig amended or restated the Trust about eight times over the years. The last time the Trust was restated was under an agreement dated August 14, 2017, two months before Craig died.

The Trust was set up to distribute assets to two groups of recipients. Under schedule "A" of the Trust, certain assets were to be distributed to the Sandahl Lineal Descendant's Trust 2017 (Descendant's Trust).[1] Beneficiaries under the Descendant's Trust were Craig's children's lineal descendants.[2] Under "Schedule B" of the Trust, the balance of the Trust assets, as well as Craig's homestead, were to be given to the Community Foundation of Greater Des Moines to be distributed to three charities. The exact value of the Trust was unclear. But besides the assets directed to the Descendant's Trust, there was about three million dollars in

---

[1] This trust is referred to by family members as the "Generation-Skipping Trust."
[2] The Descendant's Trust states:
"[My children] have been adequately provided for by me during my lifetime. . . . The purpose of this Trust is solely to provide opportunity for their lineal descendants after my demise."

cash, a million dollar house, and a refund check for $1.9 million from the Internal Revenue Service.

And Craig directed the trustees of Descendant's Trust to issue a promissory note payable to St. Paul's Episcopal Church of Des Moines. The amount of the note was to be set so that there would be no "federal estate taxes and generation skipping taxes" owed. In creating that note, Craig wanted to avoid paying any death or transfer related taxes.

By October 2017 Craig's health was declining and when it worsened on the 7th he was rushed to the emergency room. After three days in the hospital, Craig was having trouble sleeping and was anxious to get out. So Craig's family pressed the hospital to allow him to leave and he was released to go home the morning of the 10th. Apprised of Craig's deteriorating health, Ryan Sandahl, one of Craig's grandsons, flew in from Chicago and briefly visited Craig that evening but could not recall whether he discussed the Sandahl trust. Ryan and his cousin, C.J. Morton, had previously discussed with Craig his estate planning and did so "fairly regularly" for "probably over a decade."

The next morning, October 11, Ryan visited Craig again at his home but this time they discussed the trust. Ryan testified that he did not understand the numbers within the trust and was concerned. With Craig's permission, Ryan called Craig's long-time estate attorneys, Lyle and Scott Simpson, and scheduled a meeting with them. He had a two-hour meeting with the attorneys at their office that afternoon. Ryan learned there was some uncertainty about lifetime exclusions and that the estimated amount of charitable donations was about six million dollars. Ryan was surprised that the charitable amount was "candidly more" than he

anticipated. And Ryan became concerned over other aspects of the estate planning. Later that day, Ryan went back to see his grandfather and shared what he had discussed with the attorneys.

The next day, October 12, the Simpsons went to Craig's house to meet with Ryan, C.J., and Craig. The meeting lasted about a half hour. Ryan, C.J., and Scott then stepped out of the room and Lyle had a private conversation with Craig. Lyle then left the house, and Ryan and C.J. talked to Scott for another hour outside Craig's presence. Even though Ryan had been concerned about the amount of charitable donation, no one had talked about the amount of charitable donation during the meeting with the attorneys. Ryan testified that the general takeaways from the meeting were to have the attorneys document the things discussed with Craig, create some distribution to Craig's five children,[3] contribute for the taxes and upkeep of the Okoboji house,[4] and make sure there would be near-term liquidity within the Descendant's Trust. Scott was to go back "and think about how to start drafting an amendment to his trust in the near term."

---

[3] As for his children, the 2017 Trust, restated just two months earlier, states:
> Throughout their lives I have wished to be fair to each of my children. I have helped each of them whenever I could. However, their needs have been different, but I have met them the best that I felt that I could. Some have received significant financial assistance from me during my lifetime and some have received less. I have done the best that I feel I could to help each as I deemed appropriate under their circumstances. I have given my children my home on Lake Okoboji. It is time for me to concentrate my remaining assets on to helping my children's lineal descendants. Hopefully, my grandchildren and their descendants will be appreciative. I intend to do the most good that I can in my estate plan without incurring federal taxation. I want my resources that are left to do the most good that they can to help those who will truly benefit from my gift.

[4] This home had already been given to Craig's children.

There had been no discussion about the amount to be given to charity. That conversation only came up after Ryan left town for Chicago that evening. C.J. and his aunt Karin (Craig's daughter) talked to Craig about his charitable giving because they had not talked about the charitable portion when they met with the attorneys. The conversation was audio recorded. In the recording, C.J. is heard asking his grandfather "wouldn't it be better to at least give your family some of it, at sixty percent, as opposed to giving all of it away?" In another part of the recording, C.J. states, "The lawyers just gave it all to charity, all seven million." Craig's response was that he was "trying to avoid" taxes. A back and forth ensued. Craig eventually states he believes his trust is "screwed up" and he thinks "they're [the lawyers] listening," but he doesn't think "they know what to do." At which point, Karin suggests that the lawyers could draw up something by mid-week and that "at the very least it will give you [Craig] an option."

Craig called Ryan the next morning, Friday, October 13. Craig was concerned about his health and having been told "he needed to document his estate if he wanted to change it," he asked Ryan to document the discussion and "his intent of his estate." Responding to his grandfather's request, Ryan typed up a one-page document (document) setting out what he understood from the meeting with Scott and Lyle, and did his best to write out Craig's intent.

Ryan titled the document "Craig Sandahl Follow-Up Estate Discussion, October 13, 2017." The next line is: "Attendees Present: Ryan Sandahl (telephonically), CJ Morton, Craig Sandahl." Many parts of the document were written in the third person. For example: "While Craig would like to support charitable organizations . . . ; [h]is kids are instructed to use money . . . ; Craig

reiterates that he wishes to be charitable and minimize taxes but that he believe[s] he has gone too far . . . ." The document ends with: "This document will be provided to Lyle and Scott Simpson for incorporation into Craig's Estate Plan."

After Ryan emailed the document to C.J., there was another meeting between Craig, C.J., and Ryan. Ryan participated by phone. The three discussed the document and Craig suggested the figure "2" be inserted in a line left blank on the document for "contributing up to $__ to charity . . . ." The final document reads:

Re: Craig Sandahl Follow-Up Estate Discussion, October 13, 2017:

Attendees Present: Ryan Sandahl (telephonically), CJ Morton, Craig Sandahl

Based on further discussions regarding Craig's existing trust, it has become apparent that Craig's wish to minimize the payment of federal taxes has led to a structure where a significant portion of his estate, potentially in excess of $6 million dollars has been designated for donation to charity.

While Craig would like to support charitable organizations, which he has listed in his Estate Plan, he did not wish to or understand that he was contributing this significant of an amount.

Craig has stated to CJ and Ryan and certifies with his signature below and with verbal evidence that he is supportive of contributing up to $2 million to charity to minimize taxes and the balance of his estate that is not currently being contributed to the Generation Skipping Trust shall be distributed among his five kids which distribution to the kids shall be no less than $1 million in the aggregate, after taxes.

His kids are instructed to use this money in the near-term to continue to support endeavors that he has supported throughout his life including education, business investment, ownership and health and wellbeing, among others, including for non-lineal descendants of the Sandahl family such as Ruth Evans.

This immediate distribution will be to the kids as Beneficiaries, not Trustees although this distribution will also be taken in to consideration by the Generation Skipping Trust and intended to alleviate nearterm distributions from this Trust and from the similar

South Dakota Trust so these can be managed to create a greater ability for liquidity and growth in the future.

These changes are in addition to the changes that were discussed with Lyle Simpson and Scott Simpson in-person with Craig, CJ and Ryan on October 12, 2017, including:

- Contribution of money to same LLC as the Okoboji properties of $250,000
- Appropriate modification to the Generation Skipping Trust to make Craig's five kids the initial decision makers for distributions under this Trust as managed by Ryan and CJ
- No less than $1 million dollars in aggregate, after taxes, distributed to the five kids as modified by the instructions from Craig that are above

Craig reiterates that he wishes to be charitable and minimize taxes but that he believe he has gone too far in that effort in his existing trust and wishes to modify in the manner stated herein.

This document will be provided to Lyle and Scott Simpson for incorporation in to Craig's Estate Plan.

After C.J. and Craig signed the document, C.J. scanned it and emailed it to Ryan. Ryan signed the copy he received and emailed it back to C.J. and to Scott Simpson. Scott forwarded email to Lyle because Lyle was the one working on drafting an amendment to the Trust. Scott "had questions about the use of precatory words and the use of directive words" and was not sure whether those words were directed to the trustee or to the beneficiaries. The allocation of the two million dollars among the charities was also not clear to Scott. Plus, he was not sure whether there was an intent to create a trust with the children as trustees.

In his attempt to make sure that he understood Craig's intent, Scott called Ryan to obtain further clarifications. Ryan answered Scott's questions and tried to recount Craig's intent. To ensure Scott understood Ryan's explanation of Craig's intent, Scott drew up a distribution diagram and emailed it to Ryan. They discussed

the diagram over the phone. Scott wanted to make sure the amendment Lyle was preparing was an accurate representation of Craig's intent. The plan was to have Craig execute a formal amendment the following Tuesday, October 17, but Craig passed away Saturday, October 14.

The Iowa State Bank, as successor trustee of the Trust, petitioned for judicial interpretation of the terms of the August 14, 2017 Trust, as may have been later amended. After a hearing, the district court found the document "ambiguous" and concluded Craig did not intend the October 13 document to constitute an amendment to the Trust or to any of his estate plans.

The Sandahl children now appeal.

## II. Standard of Review.

A declaratory judgment action to interpret a trust is tried in equity. *See* Iowa Code § 633.33 (2015). Our review for interpreting a trust agreement tried in equity is de novo. *In re Estate of Rogers*, 473 N.W.2d 36, 39 (Iowa 1991). We give weight to the findings of fact made by the trial court, but are not bound by them. *Barron v. Snapp*, 468 N.W.2d 841, 843 (Iowa Ct. App. 1991).

## III. Analysis.

The Sandahl children contend the four corners of the October 13, 2017, document evidence Craig's intent that it modify the Trust. Alternatively, they argue, extrinsic evidence shows Craig's intent that the document amend the Trust.

The general rules of construction apply when interpreting wills and trusts. *In re Work Family Trust*, 151 N.W.2d 490, 492 (Iowa 1967), *Barron v. Snapp*, 468 N.W.2d 841, 843 (Iowa Ct. App. 1991). In interpreting a trust, we consider the document as a whole and reconcile all provisions of the trust when reasonably

possible. *In re Steinberg Family Living Tr.*, 894 N.W.2d 463, 468 (Iowa 2017). We will resort to technical rules or canons of construction only if the trust language is ambiguous or if the settlors' intent is somehow unclear. *Snapp*, 468 N.W.2d at 843, *Matter of Luella Taylor Tr.*, No. 17-1581, 2018 WL 5292093, at *4 (Iowa Ct. App. Oct. 24, 2018). When we find the terms of a trust unambiguous, we are precluded from interpreting those terms. *In re Estate of Kiel*, 357 N.W.2d 628, 630 (Iowa 1984), *Snapp*, 468 N.W.2d at 843. Language within a trust is ambiguous when it is reasonably susceptible to more than one meaning. *McCarthy v. Taylor*, 17 N.E.3d 807, 818 (Ill. App. Ct. 2014). There are two kinds of ambiguity, patent and latent. *In re Lepley's Estate*, 17 N.W.2d 526, 529 (Iowa 1945). Patent ambiguity is what appears on the face of the will and arises from the phraseology or the defective, obscure, doubtful or uncertain language. *Id.* It arises upon the reading of the will. *Id.* Latent ambiguity exists where the language of the instrument does not lack certainty but some extrinsic or collateral matter outside the will renders the meaning obscure and uncertain. *Id.*

In examining the language of the document, the district court concluded:

> The document is not entitled "Amendment," "Restatement," "Modification," or any similar title, but rather "Re: Craig Sandahl Follow-Up Estate Discussion, October 13, 2017." While no formal language is required to make an amendment to a trust, this language supports a finding that the document was meant merely to serve as correspondence with Craig's attorneys regarding proposed changes to his estate plan.
> While the following paragraphs in the one page document reference the current estate plan and express the possibility of changes, which arguably could seem to contradict a finding that Craig did not intend to amend the Trust, some of the language in the document could be considered precatory rather than instructive. For example, it states that Craig "is supportive of" contributing to charity and that he "wishes" to modify his estate plan. Scott, who had spoken with Craig about these potential changes only a day before,

was unable to discern how the document was intended to be incorporated into the Sandahl Trust and Craig's estate plans. Furthermore, the document is written in the third person format, as though the scriber was expressing his desires rather than that of the trustor.

The October 13 Document fails to make any reference to the Sandahl Trust. The only trusts referenced in the document are different trusts in Craig's estate plan. The "Generation Skipping Trust" referenced in the Document presumably refers to the Sandahl Lineal Descendant's Trust (the "Sandahl Descendant Trust"), a revocable trust created on August 14, 2017. The "South Dakota Trust" referenced in the Document presumably refers to the South Dakota irrevocable trust (the "South Dakota Trust"), created by Craig in 2004. Taken as a whole, the October 13 Document is ambiguous as to whether Craig did, in fact, intend to amend his estate plan or if he simply chose to document his instructions to his estate planning attorneys for further discussions about potential revisions to his overall estate plan. The language that "This document will be provided to Lyle and Scott Simpson for Incorporation into Craig's Estate Plan" raises the question why didn't the document say this is an amendment to my Trust rather than saying it is to be incorporated into the estate plan. Furthermore, even if an instrument is found (whether under its four corners or by reference to extrinsic evidence) to be intended as an amendment, such amendment may be nonetheless ineffectual if found to be insufficiently clear, and thus void for vagueness.

(Footnotes omitted.) We agree with the court's analysis. There is no mention of the Trust within the document. There is also no mention that the document should be considered an amendment to or incorporated within the Trust. The document's reference to "Craig's Estate Plan" could be a reference to the Trust, but it could also be a reference to Craig's overall estate planning. The words "he is supportive of contributing up to $2 million" are unclear. This language on its face is at best ambiguous because the contribution can be any number between zero and two million dollars. The document does not explain any basis for arriving at a number, or who would decide. The document calls for distributing the "balance of his estate that is not currently being contributed to the Generation Skipping Trust shall be

distributed among his five kids which distribution shall be no less than $1 million in the aggregate, after taxes." Again, there is no instructions as to how the distribution will be allocated among the five children. Whether the distribution should be equal among the siblings remains unclear. The document fails to describe the mathematical steps to follow to satisfy both the charity donation of "up to two million" and at the same time distributing "no less than $1 million in the aggregate, after taxes" to the children. The meaning of "near-term" is unclear within the sentence "his kids are instructed to use this money in the "near-term" to continue to support endeavors . . . ." We have no guidance on the time that corresponds to the words "near-term." Siblings are likely to have their own interpretation of the word "near-term." The use of the term "Immediate distribution will be to the kids as Beneficiaries, not Trustees" is ambiguous. The sentence is not clear as to which trust should the children become beneficiaries to and whether there should be another trust created to distribute that money. It also appears the document is incomplete. It states, "These changes are in addition to the changes that were discussed with Lyle Simpson and Scott Simpson . . . *including*: [listing three changes]." (Emphasis added.) This suggests Craig was contemplating other changes but they were not included within the document, thus making the document incomplete as to Craig's intent. All this vagueness contributes to the document's ambiguousness.

After finding the document ambiguous, the district court examined the extrinsic evidence to determine Craig's intent, and it concluded:

> The testimony offered showed Craig was considering changes to his estate plan. However, it is clear that all parties involved in those discussions—Craig, Ryan, C.J., Lyle, and Scott—

contemplated that Lyle and Scott would draft a formal document to implement any of those changes. Craig, and his grandsons, were aware of the attorneys' efforts in drafting such a document, yet not one of them instructed Scott or Lyle that drafting an amendment would be unnecessary following the October 13 Document. This demonstrates Craig's intention to put his thoughts about potential changes to his estate plan in writing, not to execute the October 13 Document as an amendment.

Craig's estate planning attorneys, who surely knew his intentions following their discussion on October 12, evidenced the October 13 Document was not intended to be an amendment by continuing to work on drafting a formal amendment even after receiving the October 13 Document. Moreover, Scott stated in his email that the October 13 Document "guided our effort in drafting amendments." The statements and actions of Craig and his estate planning attorneys provide further support for the finding that this was merely intended to be an instructional letter.

But perhaps most indicative that Craig did not intend the October 13 Document to be an amendment is the formality and specificity of his other estate planning documents. Each previous amendment to the Sandahl Trust is clearly entitled "Amendment" and identifies the exact paragraph of the Sandahl Trust changed by the amendment. Craig recurrently made changes to his estate plans and utilized the assistance of his estate planning attorneys to do so. The August Restatement, for example, is a formal, twenty-three page document with two attached schedules, prepared by Lyle and Scott on Craig's behalf. It seems inconsistent that Craig would intend an informal document drafted by his grandson, entitled "Re: Craig Sandahl Follow-Up Estate Discussion," to constitute an amendment making significant changes to his estate plan, where all previous changes were made through formal documents drafted by his attorneys—who were in the process of drafting such a document at the time of his death.

Although Craig was clearly considering making changes to his estate plans, the facts presented do not support a finding that he intended the October 13 Document to amend the Sandahl Trust. Rather, the testimony and evidence offered show Craig's intention to put his thoughts about these potential changes into writing in order to guide his attorneys in drafting an amendment, to be further discussed and potentially executed at a later date. The Document is vague, obscure, and ambiguous and requires speculation as to Craig's intent. The Document states that Craig "is supportive" of contributing "up to" two million dollars to charity, but fails to specify which charities shall receive the contribution and what amounts such charities should receive. The August Restatement (and, for that matter, every other prior iteration or amendment to the Sandahl

Trust) includes clear distributions of trust assets to specific charities in specific amounts.

(Footnotes omitted.)  Again, we agree with the district court's analysis.  Even after considering the extrinsic evidence, we cannot conclude the October 13, 2017 document was intended to amend the Trust.  It may be clear that Craig contemplated adjusting his estate planning, but the evidence presented shows the document was a summary of his thoughts to be submitted to his attorneys to prepare a formal amendment to be discussed further before execution. Unfortunately Craig passed away before that could be done.  Now, after the fact, the children argue it was Craig's intent that the document amend the Trust.  Their argument is understandable and not unreasonable.  Yet if the intent of the document is reasonably susceptible to more than one meaning, the amendment clause is ambiguous.  *See McCarthy*, 17 N.E.3d at 818.

In sum, we agree with the district court and find the October 13, 2017, document to be ambiguous and void for vagueness.  And after reviewing the record, we, like the district court, do not find persuasive extrinsic evidence to resolve the multiple ambiguities within the document.  Thus, we agree with the district court that the October 13, 2017, document is not an amendment to the Sandahl Trust 2017.

**AFFIRMED.**